# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6442 | **DATE** | 1/30/2004 |
| **CASE TITLE** | Michelle M. Maiter vs. Harris Bankcorp | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  Enter Memorandum Opinion And Order. The court grants Harris Bank's motion for summary judgment (Doc. No. 10-1), and enters judgment in favor of Defendant.
(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | 2 number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | FEB 02 2004 date docketed | |
| | Docketing to mail notices. | | | 17 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | 1/30/2004 date mailed notice | |
| ETV | courtroom deputy's initials | | | |
| | | Date/time received in central Clerk's Office | ETV mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MICHELLE M. MAITER, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>HARRIS BANKCORP, INC., a )<br>Delaware corporation, )<br>)<br>Defendant. ) | No. 02 C 6442<br><br>Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Plaintiff Michelle Maiter ("Maiter") filed suit against her former employer, Defendant Harris Bankcorp, Inc. ("Harris Bank"). In her complaint, Maiter alleges that Harris Bank terminated her employment on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.* ("Title VII"). Harris Bank moves for summary judgment, arguing that Maiter cannot establish that (1) similarly situated male employees were treated more favorably, or (2) the proffered reason for Maiter's termination was pretextual. For the reasons set forth below, the court grants Harris Bank's motion.

## FACTUAL BACKGROUND

Harris Bank has submitted a Local Rule 56.1 Statement setting forth the material facts as to which it contends there is no genuine dispute. (Defendant's Statement of Undisputed Material Facts, hereinafter "Def. Facts.") Maiter has failed to respond to the Bank's statement of facts or to submit her own statement of facts as required by the local rules. Thus, the facts set forth by Harris Bank are deemed admitted.

Maiter is a high school graduate and has some college and professional education. (Def. Facts ¶ 2; Def. Ex. 1 to Defendant's Motion for Summary Judgment (hereinafter "Def. Motion"). Prior to working for Harris Bank, Maiter held a number of banking positions with other financial institutions, including working as an officer and customer service representative for Citibank, as a

bank teller and senior personal banker for NBD/First Chicago Bank, and as a bank teller and customer service representative for Presidential Mortgage Company. (*Id.* ¶ 3; Employment Application, Def. Ex. 1 to Def. Motion.)

Following interviews with Dianne Gardiner, West Regional Operations Manager for Harris Bank at that time, and West Regional President Maureen Bell, Maiter was hired to work as Branch Manager of Harris's Roselle Branch in May 1998. (*Id.* ¶¶ 4, 5; Maiter Dep., at 33-34.) Gardiner hired Maiter and was her direct supervisor throughout Maiter's employment. (*Id.* ¶ 6; Maiter Dep., at 34-35; Gardiner Dep., at 23-24.)

In her capacity as Branch Manager, Maiter was an officer of the Bank. (*Id.* ¶ 4; Maiter Dep., at 42-43.) She was responsible for the Roselle Branch's profitability, supervision of the employees at the Branch, and achievement of customer service objectives. (*Id.* ¶ 8; Maiter Dep. 39-42; Job Description, Def. Ex. 14 to Def. Motion.) She was also expected to ensure that all branch employees, herself included, adhered to the ethical and regulatory standards of the banking industry, and to Harris Bank's policy regarding conflicts of interest. (*Id.* ¶ 9; Maiter Dep. 43-47; Def. Ex. 14 to Def. Motion.) Maiter understood that under the Bank's conflicts of interest policy, an employee was not to perform transactions on his or her own behalf or on behalf of immediate family members. (Maiter Dep., at 46-47.) Maiter notes that this policy was not in writing and that employees were not formally trained on it. (*Id.*)

One issue related to Maiter's job responsibilities that implicated adherence to ethical standards was Harris Bank's teller guidelines regarding "forced balancing." (Def. Facts ¶ 10; Gardiner Dep., at 48.) Forced balancing is Harris Bank's term for misstatement by a teller of the amount of money in the teller's cash drawer. (*Id.*; Gardiner Dep., at 48-49.) Harris Bank's tellers were terminated for forced balancing for amounts of even less than a dollar. (*Id.*; Gardiner Dep., at 48.) Maiter was responsible for holding the tellers at her branch to this high level of ethical behavior, and Gardiner admits that Maiter did so quite well. (*Id.*; Gardiner Dep., at 49.)

2

Another issue related to Maiter's job responsibilities that implicated both profitability and conflicts of interest was the reversal of service charges and fees charged to customers for overdrafts, wire transfers, check printing, falling below minimum balances, and other services. (*Id.* ¶ 11; Maiter Dep., at 41, 53.) Harris Bank policy required service charge reversals to be approved by two employees (*Id.* ¶ 13; Maiter Dep., at 50), one of whom had to be either Maiter herself, Teller Supervisor Therese Cygan ("Cygan"), or Senior Personal Banker Elizabeth Henderson ("Henderson"). (*Id.* ¶¶ 12, 13; Maiter Dep., at 49-52.) Maiter and the other employees at her branch received training concerning service charge reversals, but that training did not include any specific direction concerning authorization of service charge reversals *on an employee's own account*, nor was there any written policy regarding such reversals. (*Id.* ¶ 15; Gardiner Dep., at 31-36; Certificate of Completion, Def. Ex. 6 to Def. Motion; Def. Ex. 7 to Def. Motion; Maiter Dep., at 73, 75.) Gardiner explained, however, that in her view an employee who wanted to reverse a service charge to his or her own account needed the approval of a manager at the same or higher level of authority as the employee. (*Id.* ¶ 14; Gardiner Dep., at 39-40.) In June 2001, at a regular monthly meeting, Gardiner instructed all West Region managers who reported to her, including Maiter, that the region's service charge reversals were excessive and that branch managers should work to reduce them. (*Id.* ¶ 16; Maiter Dep., at 56-57; West Region Manager's Meeting Agenda, Def. Ex. 2 to Def. Motion.)[1]

---

[1] The parties agree that excessive service charge reversals were discussed at the June meeting, and that Gardiner asked the branch managers to work to reduce them. The June agenda (Def. Ex. 2), however, under "Open Parking Lot Issues and Action Items," contains handwritten notes pertaining to fee waivers and discussion about procedures for such waivers. A note in what seems to be the same handwriting appears on the September Agenda (Def. Ex. 5), beside the title "Service Charges" and indicates that the matter was discussed at that meeting: "reminder about waiving charges go through correct authority levels for requesting waivers on own accounts." Maiter claims that when she was given the June and September agendas (Def. Ex. 2 and 5), there were no handwritten notes on them. (Maiter Dep., at 175-177.) Gardiner, on the other hand, claims that agendas were sometimes sent out with handwritten notes on them. (Gardiner Dep., at 65.) Gardiner testified that her own copies of the agendas were maintained as a
(continued...)

3

In September 2001, while Gardiner was vacationing in South Carolina, she received a phone call from Dave Franzen, who was Regional Finance Manager at the time. (Gardiner Dep., at 22, 28). Gardiner recalls that Franzen told her he had received a phone call from an ex-customer of the Bank, Franca Medigovich ("Medigovich"), who had made certain allegations about Maiter relating to service charge reversals. (*Id.* at 28.) Gardiner instructed Franzen to ask Medigovich to provide the information in writing. (*Id.*) Later, Gardiner called Maiter and asked her whether she knew what Medigovich had been talking about. (*Id.* at 29; Maiter Dep., at 114.) In this conversation, Maiter described the circumstances in which Medigovich's account was closed. Gardiner was satisfied with Maiter's explanation, concluded that Maiter had handled the matter appropriately, and undertook no further investigation of Medigovich's allegations. (*Id.* at 28-29.)

On November 14, 2001, Harris Bank again heard from Ms. Medigovich, by way of an e-mail message in which Medigovich asserted that Maiter had disclosed confidential customer information, reversed service charges, and performed other inappropriate favors for her friends, including her boyfriend, Timothy Kidd. (Def. Facts ¶ 18; Gardiner Dep., at 27, 30; Pl. Ex. 5 to Def. Motion.) Gardiner testified that West Region President Bell gave her a copy of this e-mail message. (Gardiner Dep., at 27.) In response, Gardiner initiated an investigation of some of the accounts identified in Medigovich's message. (Def. Facts ¶ 17; Gardiner Dep., at 27; Pl. Ex. 5 to Def. Motion.) In reviewing records of Kidd's account, Gardiner found four service charge reversals on his checking account between February and May 2001. (*Id.* ¶ 19; Gardiner Dep., at 30-31; Def.

---

[1](...continued)
permanent record (*id.* at 62), and that during meetings, Gardiner, her assistant Carrie Rhodes, or the administrative specialist Iesha Johnson would take handwritten notes on the agenda. (*Id.* at 63.) Maiter does not remember that reversal of service charges on employees' personal accounts was ever discussed at the September meeting. (*Id.* at 72.) Neither party has submitted copies of notes which the September Agenda appears to contemplate would be taken by Brian Watson (see Def. Ex. 5, bottom, "Note Taker: Brian Watson"). Although the parties have devoted significant attention to this matter, the court concludes it is not material to the outcome of this motion. Whether or not Maiter was formally notified about the Bank's policy for waiving charges, the record shows that it was this policy that led to a review of Maiter's own accounts, described below.

Ex. 8, 9 to Def. Motion.) Gardiner also investigated Maiter's own Harris Bank accounts and discovered service charge reversals, noted as "courtesy reversals," on October 15, October 19, and November 8, 2001 in an account held jointly by Maiter and her mother. (*Id.* ¶¶ 20-22; Maiter Dep., at 90-94; Gardiner Dep., at 31, 38; Def. Ex. 10, 11 to Def. Motion.) Maiter acknowledged that she benefitted financially from these charge reversals. (*Id.* ¶ 24; Maiter Dep., at 154-55.) Henderson, who was Maiter's subordinate, had processed the October 19 and November 8 reversals at Maiter's request.[2] (*Id.* ¶ 23; Maiter Dep., at 90-94; Def. Ex. 11 to Def. Motion.)

As Henderson's supervisor, Maiter evaluated Henderson's performance, had input into her compensation, determined her schedule, and could approve or deny her requested days off. (*Id.* ¶ 25; Maiter Dep., at 85-86.) Although Maiter says she typically phrased her instructions to subordinates as polite requests, she acknowledged that a subordinate's refusal to comply would constitute insubordination and would subject the subordinate to possible discipline or termination. (*Id.* ¶¶ 26, 27; Maiter Dep., at 169-70.) Nevertheless, Maiter believes that Henderson would have refused to process the service charge reversals on Maiter's joint account with her mother if Henderson had felt uncomfortable or thought Maiter's request was inappropriate. (*Id.* ¶ 28; Maiter Dep., at 103-06, 168-69.) Gardiner pointed out that Maiter could have asked Assistant Regional Operations Manager Carrie Rhodes, Regional Sales Manager Greg Walsh, Regional Finance Manager Franzen, or Gardiner herself (her office was located at the Roselle Branch) to approve the service charge reversals on Maiter's joint account with her mother. (*Id.* ¶ 29; Gardiner Dep., at 9, 17, 22, 39-40.) Maiter did not in fact ask Gardiner or any peer or supervisor to approve the

---

[2] While Def. Ex. 10 does show a service charge reversal on October 15, 2001, Def. Ex. 11 does not contain the General Ledger Debit slip with the authorization signatures for this reversal (presumably because the October 15 reversal was completed "on-line", see Def. Ex. 10, page 4, right-most column). In her deposition, Maiter admitted requesting only two of the reversals, but not the third - the one for which she did not see a General Ledger Debit slip in Def. Ex. 11. (Maiter Dep., at 94, lines 15-20.) Because Maiter offers no basis for the court to conclude that Gardiner did not genuinely believe there had been a service charge reversal on October 15, 2001, the court concludes that any dispute concerning this matter is not material.

service charge reversals that Henderson processed. (*Id.* ¶ 30; Gardiner Dep., at 36, 44; Maiter Dep., at 101.) Gardiner testified that, had Maiter asked her, Gardiner would not have approved all of the service charge reversals because she believed that Maiter, as a Bank Officer, should have managed her personal accounts responsibly. (*Id.* ¶ 31; Gardiner Dep., at 38-39.)

Upon discovering the service charge reversals on Maiter's joint account with her mother, Gardiner considered Maiter's conduct to constitute potential misappropriation of bank funds for personal gain. (*Id.* ¶ 32; Gardiner Dep., at 44-45.) For this reason Gardiner asked John ("Jack") Laurie from the Bank's Corporate Security department to conduct a further investigation. (*Id.*; Gardiner Dep., at 20, 43, 45.) On November 19, 2001, Laurie interviewed Maiter at the bank office in downtown Chicago about the service charge reversals on the joint account. (*Id.* ¶ 33; Gardiner Dep., at 49-50; Maiter Dep., at 94-95.) At the conclusion of the interview, Maiter signed a written statement in which she asserted that her mother, who had been battling cancer, "contacted Henderson to have these fees reversed." (*Id.* ¶¶ 34- 35; Maiter Dep., 97-98; Def. Ex. 12 to Def. Motion.) Also on November 19, 2001, Henderson reported to Gardiner that Maiter had called her right after the interview and asked Henderson to lie by telling Laurie that it was Maiter's mother, not Maiter, who had requested the service charge reversals. (*Id.* ¶ 37; Gardiner Dep., at 50-51.)[3]

Maiter does not admit that she asked Henderson to reverse the service charge fees on Maiter's joint account with her mother. (*Id.* ¶ 35; Maiter Dep., at 98; Def. Ex. 12 to Def. Motion.) Harris Bank, however, has submitted as an exhibit in support of its motion for summary judgment

---

[3] In her deposition, Gardiner testified that she received an "hysterical phone call" from Henderson who reported that Maiter had called her and asked her to attribute the request for a reversal of service charge fees to Maiter's mother, rather than to Maiter herself. (Gardiner Dep., at 50-51.) While what Henderson told Gardiner about Maiter's phone call is hearsay, i.e. an out-of-court assertion offered for its truth, it may be admissible under the then-existing state of mind exception to the hearsay rule. *See* FED. R. EVID. 803(3). Furthermore, as Maiter has not responded to Harris Bank's Statement of Undisputed Facts as required by Local Rule 56.1, Harris Bank's assertion that Maiter asked Henderson to lie about who requested the service charge reversals is presumed true for the purposes of this summary judgment motion.

a print-out of an e-mail message that Maiter admits she sent to Henderson on November 7, 2001. (Id. ¶ 36; Gardiner Dep., at 47-48; Maiter Dep., at 98-99; Def. Ex. 13 to Def. Motion.)[4] In that e-mail, Maiter asked Henderson to "credit [her] mom's account $12.00 for the maintenance charge" (the November 8, 2001 fee reversal), and promised to "take [Henderson] out to lunch for doing all of this for [her]." (Id.; Maiter Dep., at 98-99; Def. Ex. 13 to Def. Motion.)

On November 19, 2001, after his interview with Maiter, Jack Laurie confirmed to Gardiner that Maiter had been "reversing service charges on her own account." (Id. ¶ 38; Gardiner Dep., at 50-51.) Gardiner determined that Maiter had not sought or received proper authorization for the service charge reversals on her joint account with her mother. (Id. ¶ 39; Gardiner Dep., at 36, 44; Maiter Dep., at 116-17.) Gardiner considered Maiter's conduct to constitute misappropriation of funds for personal gain and decided to terminate Maiter's employment for this reason. (Id. ¶¶ 39-40; Gardiner Dep., at 36-37, 44, 62, 66.) Gardiner consulted her supervisor, West Regional President Bell, and Hope Ferguson from Human Resources, both of whom concurred with her decision. (Id. ¶ 40; Gardiner Dep, at 36-37, 44-45, 67-68; Maiter Dep., at 116-17.) Late on November 19, 2001, Ferguson telephoned Maiter and informed her that her employment with Harris Bank was terminated because she had directed Henderson to credit her joint account with her mother without proper authorization. (Id. ¶ 41; Maiter Dep., at 115-17.)

In November 2001, before Maiter was terminated, Gardiner supervised nine Branch Managers including Maiter: three men and six women. (Id. ¶ 7; Maiter Dep., at 35-38.)[5] Gardiner

---

[4] The record does not show when or how Bank officers found the e-mail, nor is the court certain whether either Gardiner or Laurie interviewed Henderson before Maiter's termination. On its face, the e-mail (Def. Ex. 13) shows that Henderson forwarded it to Gardiner on November 20, 2001, the day after Maiter's termination, but in her deposition Gardiner indicates that she had the e-mail before she decided to terminate Maiter's employment on November 19, 2001. (Gardiner Dep., at 47-48.)

[5] Harris Bank's Undisputed Statement of Material Fact states, in ¶ 7, that on November 21, 2001 Gardiner supervised nine Branch Managers including Maiter. The court notes, (continued...)

7

was assisted in her duties by Rhodes (female). (*Id.*; Gardiner Dep., at 22; Maiter Dep., at 39.) After her termination on November 19, 2001, Maiter's duties were assumed by Rebecca Keeter (female), who was an incumbent Branch Manager at a nearby location. (*Id.* ¶ 42; Gardiner Dep., at 52.) Gardiner explained that after Maiter's termination, the Roselle Branch was merged with the branch that Keeter had been managing; Gardiner believed that Keeter was capable of managing both branches. (Gardiner Dep., at 52-53.)

Maiter knows of no employee who engaged in the same conduct for which she was discharged, that is, instructing a subordinate to credit the superior employee's own account. (Def. Facts ¶ 43; Maiter Dep., at 118.) One month after Maiter's termination, Gardiner fired Diane Battista, another Branch Manager in the West Region reporting to Gardiner, for misappropriating funds by using money found on the floor on the customer's side of the bank counter to buy pizza and office decorations. (*Id.* ¶ 44; Maiter Dep., at 35-36, 174; Gardiner Dep., at 66-67.) Battista was replaced by Ben Kerchov. (Gardiner Dep., at 67-68.) Gardiner knows of no employees in the West Region who misappropriated funds and were not discharged. (Def. Facts ¶ 45; Gardiner Dep., at 37.)

Maiter's claim of gender discrimination is based on her belief that two male employees, Sam Vardalos and Vince Demarco, engaged in similar conduct as her but were not discharged. (*Id.* ¶ 46; Maiter Dep., at 132-33.) Maiter asserts that Vardalos, a former Branch Manager, "changed loan documents" but was not terminated; Maiter believes he was "just put on corrective action or I think corrective action or immediate probation." (*Id.* ¶ 47; Maiter Dep., at 118-19.) Vardalos did not work in the West Region and was not supervised by Gardiner. (*Id.* ¶ 48; Maiter Dep., at 120; Gardiner Dep., at 57-59.) Gardiner has no knowledge about this incident involving Vardalos or anything else about his performance. (*Id.* ¶ 48; Gardiner Dep., at 57-59.) Maiter's own information

---

[5](...continued)
however, that Maiter was discharged on November 19, 2001.

8

concerning the incident is limited to what Vardalos himself told her in a telephone conversation just after Maiter's termination; she does not know whether any of Vardalos's supervisors knew about the alleged behavior, nor does she know what action, if any, Harris Bank took in response. (*Id.* ¶ 49; Maiter Dep., at 119-122.)[6] Maiter does not believe the loan for which Vardalos allegedly changed documents was for himself, nor does she know specifically whether or how Vardalos may have benefitted personally from his misconduct. (*Id.* ¶ 50; Maiter Dep., at 120-21.) Maiter claims, however, that if a manager changed loan documents to increase the loan totals for the quarter, the manager would get a large quarterly manager's incentive. (Maiter Dep., at 121.)

Maiter claims she heard from Rebecca Keeter that at some time between 1998 and November 2001, Vince Demarco violated Harris Bank policy by not requiring proper customer identification when opening a bank account, causing a $10,000 loss to the Bank. (Def. Facts ¶ 51; Maiter Dep., at 123, 125.) Maiter does not know whether Demarco benefitted personally from the alleged behavior and does not know what action, if any, Harris Bank took in response. (*Id.* ¶ 52; Maiter Dep., at 125.) At the time of the alleged incident, Demarco was an Assistant Manager and/or Personal Banker and was supervised by Keeter who, in turn, was supervised by Gardiner. (*Id.* ¶ 53; Maiter Dep., at 123-24; Gardiner Dep., at 59-60.) Gardiner testified that she was not "familiar with anything in particular" about the incident, does not know if the incident occurred, and "cannot speak with any level of competence" about it. She also notes that Keeter would have been responsible for dealing with the incident herself. (*Id.*; Maiter Dep., at 125; Gardiner Dep., at 60-61.) 60-61.)

---

[6] The court assumes Vardalos's statements are admissible as statements against his interest, *see* FED. R. EVID. 804(b)(3), but notes some curiosity about Maiter's failure to provide an affidavit from him.

9

## DISCUSSION

### A.  Standard of Review

The standards for evaluating a motion for summary judgment are familiar. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462 (7th Cir. 2002). The court's function is not to weigh the evidence but merely to determine if "there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In making this determination, the court will construe facts and draw inferences in the light most favorable to the nonmoving party. *Id.* at 255. The nonmoving party, however, may not "merely allege the existence of a factual dispute to defeat summary judgment," but must instead offer evidence sufficient to support a verdict in his favor. *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001) (quoting *McPhaul v. Board of Comm'rs of Madison County*, 226 F.3d 558, 563 (7th Cir. 2000)).

### B.  Failure to Comply with Local Rule 56.1

Local Rule 56.1 ("L.R. 56.1") details this court's requirements for filing and responding to a summary judgment motion. As noted, Maiter failed to abide by the requirements set forth in L.R. 56.1(b)(3), and submitted no response to Harris Bank's 56.1 Statement. She failed to specifically respond to each of Harris Bank's undisputed facts and did not offer evidence to corroborate her position on those facts that she contradicted in her Response to Motion For Summary Judgment. Because Maiter failed to comply with L.R. 56.1, the material facts set forth in Harris Bank's statement of facts are deemed admitted. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 937 (7th Cir. 2003). Nevertheless, to the extent that Maiter has challenged the Bank's version of events in

10

her brief in opposition to summary judgment, the court has construed materials in the record in the light most favorable to her.

## C. Gender Discrimination in Violation of Title VII

Maiter claims that Harris Bank discharged her because of her gender in violation of Title VII. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e2(a)(1). A plaintiff can prove Title VII discrimination by producing direct evidence of discrimination or by proceeding under the *McDonnell Douglas* burden-shifting method. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See also Contreras v. Suncast Corp.*, 237 F.3d 756, 761 (7th Cir. 2001). The parties agree that since Maiter has no direct evidence of discrimination, she must establish her case under the burden-shifting method.

Under that framework, Maiter must establish a prima facie case of discrimination by demonstrating that (1) she belongs to a protected class, (2) she performed her job satisfactorily and satisfied her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) her employer treated similarly situated employees outside of her protected class more favorably. *McDonnell Douglas*, 411 U.S. at 802; *Contreras*, 237 F.3d at 759. If Maiter satisfies each of these elements, Harris Bank has the opportunity to present a legitimate, non-discriminatory explanation for her discharge. *See Contreras*, 237 F.3d at 802-03. The Bank "need only produce admissible evidence which would allow the trier of fact to rationally conclude that the employment decision has not been motivated by discriminatory animus." *Id.* at 760 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 257 (1981)). If Harris Bank successfully satisfies this requirement, Maiter has the burden of proving that the Bank's proffered reason is a pretext for discrimination. *Id.*

11

The parties agree that Maiter can establish the first three prongs of the *McDonnell Douglas* framework: She belongs to a protected class (female), she satisfied Harris Bank's legitimate job expectations in the sense that she has the experience and qualifications for the position, and she was discharged. Harris Bank argues, however, that Maiter cannot establish the fourth prong of her prima facie case because she cannot show that Harris Bank treated similarly situated employees outside of her protected class more favorably. Even if she could do so, Harris Bank argues, it nevertheless is entitled to summary judgment because on this record, no jury could reasonably conclude that the Bank's stated reason for her discharge was a pretext for gender discrimination. Maiter argues that two similarly situated males, Sam Vardalos and Vince Demarco, were treated more favorably than she was treated. She urges, further, that the Bank's stated reason for discharging her – misappropriation of funds for personal gain – was pretextual because she did not violate any Bank policy regarding the reversing of fees and charges to her own account.

1. **Similarly Situated Employees**

A plaintiff may demonstrate that another employee is similarly situated to her by "showing that there is someone who is directly comparable to her in all material respects." *Peele v. Country Mutual Insurance Co.*, 288 F.3d 319, 330 (7th Cir. 2002). *See also Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). In determining whether employees are similarly situated, "a court must look at all relevant factors, the number of which depends on the context of the case." *Radue*, 219 F.3d at 617. Furthermore, "in disciplinary cases – in which a plaintiff claims that [she] was disciplined by [her] employer more harshly than a similarly situated employee based on some prohibited reason – a plaintiff must show that [she] is similarly situated with respect to performance, qualifications, and conduct." *Id.* Ordinarily, the *Radue* court explained, this requires the plaintiff to demonstrate that she and the employees to which she compares herself "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such

differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 617-618 (emphasis added).

In this court's view, Maiter has not met this test. First, it is undisputed that Maiter reported to Gardiner throughout her employment with Harris Bank, and that Gardiner made the decision to discharge her. There is no evidence to suggest that Gardiner was also involved as a decision-maker for Vardalos or Demarco. Vardalos did not work as a Branch Manager in the West Region and was not supervised by Gardiner. Gardiner has no knowledge about Vardalos's alleged changing of loan documents and does not know anything else about his performance.[7] *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (employees with different supervisors not similarly situated). Demarco, an Assistant Branch Manager and Personal Banker, was supervised by Keeter. Gardiner did supervise Keeter, but Gardiner does not know whether Demarco actually failed to obtain proper customer identification when opening a bank account, and is not familiar with that particular incident. Moreover, Gardiner's uncontroverted deposition testimony is that if the Demarco incident had indeed occurred, Keeter, and not Gardiner, would have been the supervisor deciding whether to discharge him. *Id. See also Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 349 n.3 (7th Cir. 1997) (where different decision-makers are involved, employees are rarely similarly situated).

---

[7] Maiter argues that, although they did not work in the same region, she was nevertheless similarly situated to Vardalos since they were both Branch Managers supervised by a common supervisor: Harris Bank. This argument misreads the test set forth in *Radue*, 219 F.3d at 612. The court in that case explained that different employment decisions "made by different supervisors are seldom sufficiently comparable to establish a *prima facie* case of discrimination for the simple reason that different supervisors may exercise their discretion differently." *Radue*, 219 F.3d at 618. Thus, *Radue* explicitly recognizes that different supervisors may exercise their discretion differently without creating a prima facie showing of disparate treatment. Under Maiter's reading of the *Radue* test, in every employment discrimination case the plaintiff will be able to find that the (often) corporate defendant is the common supervisor. Maiter cites no authority for such a theory, and the court is not aware of any.

Maiter argues that, viewing the facts in the light most favorable to her, the court should conclude that Gardiner's role as Keeter's supervisor renders her responsible for the decision concerning Demarco. Such a conclusion would not preclude summary judgment here, however, because Maiter has not shown that Demarco's alleged misconduct was similar to her own. Gardiner discharged Maiter for "misappropriation of bank funds for personal gain." Harris Bank understands such an offense to be an extremely serious violation of Bank policy; Gardiner testified that Harris Bank tellers are discharged for "forced balancing" for an amount of even less than one dollar. Although Maiter believes that Demarco violated Bank policy at some point between 1998 and November 2001 by failing to require proper identification for a new account, she concedes that she does not know whether Demarco benefitted personally from his alleged behavior and does not even know what action Harris Bank took in response. In fact, there is no evidence that anyone at Harris Bank considered either Demarco's or Vardalos's conduct to constitute misappropriation of funds, nor is there any evidence that either man benefitted personally from his alleged misconduct. *See Johnson v. National R.R. Passenger Corp.*, 23 F. Supp. 2d 909, 913 (N.D. Ill. 1998) (plaintiff not similarly situated to employees who had engaged in different conduct). In contrast, approximately one month after Maiter's termination, Gardiner learned that Branch Manager Diane Battista had misappropriated funds by using cash found on the floor on the customer's side of the bank counter to purchase pizza and office decorations. Gardiner, who supervised Battista, discharged her for this misconduct.

Notably, even if Maiter were correct that Vardalos or Demarco had engaged in similar misconduct, she has presented no admissible evidence concerning how Harris Bank addressed the alleged incidents and in effect asks the court to assume they were treated more favorably than she was treated. The court is not willing to do so. As explained earlier, Vardalos was not under Gardiner's supervision and she has no knowledge regarding his alleged misconduct or any resulting disciplinary action. In addition, though Maiter claims that Keeter told Gardiner about

14

Demarco's misconduct, Maiter has no personal knowledge of that fact. Nor is she aware of how Harris Bank responded to Demarco's infraction. Summary judgment is proper where, as here, a plaintiff "has presented only her own uncorroborated, conclusory statements that similarly situated co-workers were treated differently." *Oest v. Illinois Dept. Of Corrections*, 240 F.3d 605, 614 (7th Cir. 2001). *See also Adams*, 324 F.3d at 940. As Harris Bank points out, if investigatory or disciplinary records about the Vardalos and Demarco incidents existed, Maiter was entitled to obtain them through discovery. Her failure to offer such material, on an issue as to which she bears the burden of proof, means that she has not raised a genuine issue of fact as to whether similarly situated male employees were treated more favorably.

2. **Pretext**

Having determined that no reasonable trier of fact could find that Harris Bank treated similarly situated male employees more favorably than Maiter, the court need not address whether the Bank's asserted reason for her discharge was a pretext for unlawful discrimination. *See Peele*, 288 F.3d at 326 ("[a] plaintiff does not reach the pretext stage . . . unless she first establishes a *prima facie* case of discrimination"). The court notes, however, that summary judgment is proper on this basis as well.

Maiter was discharged for violating Bank policy by directing Henderson, a subordinate, to reverse service charges on her personal account. Gardiner considered such conduct by a Bank officer to be misappropriation of funds for personal gain. During an investigation into this misconduct, Maiter told Jack Laurie from Corporate Security that her mother had asked Henderson to reverse the service charges. The evidence shows, however, that Maiter called Henderson after that meeting and asked Henderson to lie for her. Maiter baldly denies that she did anything wrong, but that is wholly insufficient to demonstrate that Harris Bank's explanation for her discharge is a pretext for unlawful discrimination. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001) (conclusory, unsupported denials are not sufficient to raise genuine issues of fact for trial).

15

Moreover, there is nothing in the record to suggest that Gardiner's decision to discharge Maiter was based on gender animus. Gardiner and Bell, both women, hired Maiter in 1998. *See Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 744-45 (7th Cir. 1999) ("where the same person does the hiring and firing of an individual, an inference arises that the firing did not result from an improper discriminatory motive"). In addition, Gardiner arranged for Rebecca Keeter, a female Branch Manager at another location, to assume Maiter's duties. *See Rooks v. Girl Scouts of Chicago*, No. 95 C 206, 1995 WL 562126, at *7 (N.D. Ill. Sept. 21, 1995) (there can be no compelling inference of discrimination when the decision-maker is in the same protected category as the plaintiff).

Maiter has not presented any evidence that Harris Bank did not honestly believe the reasons it gave for her discharge, much less that the real reason was gender discrimination. Absent such evidence, Harris Bank is entitled to summary judgment.

## CONCLUSION

The court finds no dispute of material fact on Maiter's claim of Title VII gender discrimination. For the reasons stated above, the court grants Harris Bank's motion for summary judgment (Doc. No. 10-1), and enters judgment in favor of Defendant.

ENTER:

Dated: January 30, 2004

*[signature]*
REBECCA R. PALLMEYER
United States District Judge